UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ERIC NEWBERG,

      Plaintiff,

v.                                                                                2:20-cv-646-JLB-NPM

WELLPATH RECOVERY SOLUTIONS,
DONALD SAWYER, and MELINDA
MASTERS,

      Defendants.

_____/

BILLY DEWAYNE BURR,

      Plaintiff,

v.                                                                                2:20-cv-883-JLB-NPM

DONALD SAWYER,

      Defendant.

_____/

CHRISTOPHER A. LORCH,

      Plaintiff,

v.                                                                                2:22-cv-54-JLB-KCD

MELINDA MASTERS, COURTNEY
JONES, JON CARNER, WELLPATH
RECOVERY SOLUTIONS,

      Defendants.

_____/

**ORDER ON DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED COMPLAINT**

At the Court's direction, Plaintiffs Eric Newberg, Billy DeWayne Burr, and Christopher A. Lorch filed a consolidated complaint in case numbers 2:20-cv-646-JLB-NPM (NDoc. 34), 2:20-cv-883-JLB-NPM (BDoc. 37), and 2:22-cv-54-JLB-KCD (LDoc. 56). The defendants move to dismiss the consolidated complaint. (NDoc. 35; BDoc. 38; LDoc. 57.) After carefully considering the pleadings and relevant law, the Court grants in part and denies in part the defendants' motion to dismiss the consolidated complaint. Because the remaining claims and defendants are common to all three cases, the Court consolidates this action into case number 2:20-cv-646-JLB-NPM and closes the related cases. The remaining defendants must answer the consolidated complaint within twenty-one days from the date of this order.

## I.     Background and Procedural History

The plaintiffs are involuntarily civilly committed detainees at the Florida Civil Commitment Center (FCCC) in Arcadia, Florida.[1] Each plaintiff is also a member of the FCCC's Native American community. In 2020, Mr. Newberg and

---

[1] By way of background, the State of Florida enacted the Involuntary Civil Commitment of Sexually Violent Predators' Treatment and Care Act ("Jimmy Ryce Act"), Fla. Stat. §§ 394.910-913, by which a person determined to be a sexually violent predator is required to be housed in a secure facility "for control, care, [and] treatment … until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." Fla. Stat. § 394.917(2). The Act was promulgated for the dual purpose "of providing mental health treatment to sexually violent predators and protecting the public from these individuals." Westerheide v. State, 831 So.2d 93, 112 (Fla. 2002). The state legislature, in its statement of "findings and intent," said that the Act was aimed at "a small but extremely dangerous number of sexually violent predators . . . who do not have a mental disease or defect that renders them appropriate for involuntary treatment under the Baker Act [§§ 394.451-394.4789, Fla. Stat.][.]" Fla. Stat. § 394.910 (2000).

Mr. Burr filed separate actions alleging that the FCCC administrators did not adhere to the facility's guidelines for Native American religious observances during the lockdowns implemented as a result of the COVID-19 pandemic.   (See Newberg v. GEO Group, et al., 2:20-cv-646-JLB-NPM ("NDoc."), Burr v. GEO Group, et al., 2:20-cv-883-JLB-NPM ("BDoc.").)   Through a series of amended complaints, Mr. Newberg and Mr. Burr abandoned their COVID-19-related claims and argued that post-COVID, the FCCC imposed new and stricter rules regarding their practice of religion that effectively reduced their ability to pray by about seventy percent.   Mr. Lorch filed a similar complaint on January 26, 2022.   (See Lorch v. Masters, et al., 2:22-cv-54-JLB-KCD ("LDoc.").)

### A.   Individual Complaints

Mr. Newberg filed his original complaint on August 24, 2020.   (NDoc. 1.) The Court granted the defendant's motion to dismiss Mr. Newberg's complaint with leave to amend.   (NDoc. 12.)   In his amended complaint, Mr. Newberg asserted that—even post lockdown—the FCCC had substantially departed from the policies agreed upon and set forth in a Program Statement called "PRG-26," which was implemented after he had filed a similar civil rights complaint in 2009.[2]   (NDoc. 13) The Court construed the amended complaint as raising the following claims:

> A claim under the Free Exercise Clause of the First Amendment based upon the FCCC's non-adherence to its pre-pandemic policies for Native American religious observances;
>
> A procedural due process claim based upon [Mr. Newberg's] receipt of disciplinary reports received for

---

[2] See MDFL Case No. 2:09-cv-625-CEH-DNF (Newberg I).

3

> possessing/using tobacco for religious purposes in his dormitory's backyard; and
>
> An equal protection claim based upon the FCCC's enforcement of contraband rules against Native Americans, but not against residents who practice other religions.

(NDoc. 16 at 3.)   The Court granted the defendants' motion to dismiss (NDoc. 14) on Newberg's procedural due process and equal protection claims but ordered the parties to provide the Court with the revised policies that allegedly violated the First Amendment.   (NDoc. 16 at 12.)   The parties filed a joint notice of filing a portion of the FCCC Policy and Procedure manual regarding religious services and the 2022 religious services program schedule.   (NDoc. 17-1; NDoc. 17-2.)   The defendants then filed a second motion to dismiss Newberg's amended complaint. (NDoc. 18.)

Mr. Burr filed his original complaint on November 5, 2020.   (BDoc. 1.) Upon initial screening, the Court concluded that Mr. Burr had filed a shotgun complaint and ordered him to amend.   (BDoc. 5.)   He filed an amended complaint on June 28, 2021 against eight defendants.   (BDoc. 6.)   Mr. Burr alleged (as did Mr. Newberg) that, after the pandemic, the FCCC did not follow the guidelines that were adopted after the 2009 civil lawsuit in Newberg I (PRG-26).   (BDoc. 6 at 7.) Upon screening, the Court dismissed all defendants and claims in Burr's amended complaint except for his claim that Defendant Sawyer actively blocked his right to practice his religion after it was no longer necessary to do so (post-COVID), and that the facility used the pandemic as an excuse to keep the FCCC on lockdown status. (BDoc. 9.)

After discovery, Defendant Sawyer filed a motion for summary judgment. (BDoc. 20.)   Defendant Sawyer generally asserted that "prior to August 16, 2019, the Native Americans were permitted to use the grassy knoll three times per week for their group religious practice."   (Id. at 4.)   However, on August 16, 2019, access to the knoll was restricted to one hour in the morning and one hour in the afternoon with security staff directly supervising the activities.   (Id. at 5.)   Nevertheless, there were "continued rule infractions in the area of the knoll that jeopardized the security of FCCC despite the fact that the area was monitored by staff."   (Id.)

Recognizing that the primary issue in both Newberg's and Burr's operative complaints was that the FCCC was no longer complying with PRG-26, the Court concluded that a consolidated in-person settlement conference might resolve the issues in both plaintiffs' complaints and appointed counsel for Mr. Newberg and Mr. Burr for the sole purpose of aiding them in the settlement proceedings.   (NDoc. 21; BDoc. 23.)   Unfortunately, the parties reached an impasse and did not settle the case.   (NDoc. 29; BDoc. 32.)

Mr. Lorch initiated his complaint on January 26, 2022.   (LDoc. 1.)   In his third amended complaint (LDoc. 44), Mr. Lorch asserted that Defendants Melinda Masters, Dr. Courtney Jones, Jon Carner, and Wellpath Recovery Solutions violated his First and Fourteenth Amendment rights and the "Religious Land Use Act" by denying his right to pray and to possess religious items.   (LDoc. 44.)

## B.     Consolidated Complaint

Concluding that the issues raised in these cases shared common questions of law and fact, the Court issued the following order:

5

After carefully reviewing each case file, the Court concludes that, although the cases are not currently at identical stages of litigation, the issues raised in the complaints are related, share common questions of law and fact, and would benefit from coordinated processing. Therefore, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, the Court temporarily consolidates these cases to allow the plaintiffs to file a consolidated joint complaint clarifying and streamlining the precise issues raised in these actions.[FN]

> [FN] The plaintiffs are advised that they should carefully review the Court's prior orders granting the defendants' motions to dismiss in these cases and remove any defendants, claims, or requests for relief that are no longer relevant to the First Amendment and RLUIPA claims the Court has deemed sufficient to proceed.   While the plaintiffs are free to <u>drop</u> any named parties from this action, they may not add as defendants any previously unnamed parties without Court permission unless the defendants do not oppose the addition.

(NDoc. 31; BDoc. 34; LDoc. 52.)   The plaintiffs filed a consolidated complaint on November 16, 2023 naming as defendants Donald Sawyer (former FCCC Administrator and current vice-president of Operations for Recovery Solutions), Melinda Masters (Previous Facility Administrator), Jon Carner (current Facility Administrator), Courtney Jones (Mental Health Clinical Director), and WellPath Recovery Solutions, LLC.   (NDoc. 34; BDoc. 37; LDoc. 56.)[3]

In the consolidated complaint, the plaintiffs raise two claims.[4] The first claim asserts that the defendants violated their First and Fourteenth Amendment rights

---

[3] For ease of citation, when multiple cases contain identical pleadings, the Court will cite only to the pleading in case number 2:20-cv-646-JLB-NPM (NDoc.).

[4] In addition to the claims discussed in this order, the plaintiffs raise claims that have already been dismissed by this Court.   For example, Mr. Newberg once again argues that he was unfairly disciplined for possessing tobacco.   (NDoc. 34 at

and the "Religious Land Use Act" by denying their right to pray. (NDoc. 34 at 3–5.)[5]
They state that the Native American community has a small patch of land on the
recreation yard called the "grassy knoll" that is designated for their religious use.
(Id. at 3, ¶ 2.)   They possess items needed to perform their prayers and ceremonies
such as a drum, pipe, staff, rattle, clothing, tobacco, and herbs.   (Id., ¶ 2.)   The
plaintiffs assert that certain policies and procedures were agreed upon after (and as
a result of) Newberg I in 2009.   (Id. at 3, ¶ 1.)   Specifically, they assert that
"Wellpath created and approved policy guidelines concerning the Native American
community and their right to pray [in] PRG-26 Guidelines for Native American
Religious Observances."   (Id. ¶ 3.)   They also assert that under PRG-26 (and until
the restrictions put in place to address the COVID-19 crisis), they were "permitted
the use of their proscribed religious grounds three times a week and on special
occasions."   (Id. at 4, ¶ 5.)   The plaintiffs assert that "assaults and other behavior
issues have not reduced [as a result of the post-COVID restrictions], and in most
cases have increased due to the added stress from their draconian policies."   (Id.)
The plaintiffs also broadly assert under Claim One that Defendant Masters
"suspended the use of tobacco for **ALL** Native Americans for a period of six (6)
months."   (NDoc. at 4, ¶ 7 (emphasis in original).)   Mr. Newberg asserts that he

---

4, ¶ 6.)   The Court dismissed Mr. Newberg's due-process claims stemming from his
disciplinary proceedings—with detailed explanations—twice.   (See NDoc. 12 at 6–
7; NDoc. 16 at 11.)   These claims are once again dismissed with prejudice, and the
Court will not re-consider them or any other claim that has previously been
considered and dismissed.

[5] The plaintiffs appear to refer to The Religious Land Use and
Institutionalized Persons Act ("the RLUIPA").

was suspended from attending the Native Circle as punishment for behavioral reports even though he was not in secure management.   (Id.)   Mr. Lorch asserts that he was not allowed to attend Native Circle while on wing restriction even though Christians on wing restriction were allowed to attend chapel services.   (Id. at 4–5, ¶ 7.)

In their second claim, the plaintiffs broadly assert that the defendants violated their First and Fourteenth Amendment rights by mishandling religious items.   (NDoc. 34 at 5.)   Mr. Lorch asserts that between March and October of 2021, he attempted "to obtain religious items pertinent to his spiritual beliefs and practice, all of which were subsequently denied initially."   (Id. at 5, ¶ 11.)   He was given various reasons for the initial denials of these items (Tarot Cards, Ouija Board, and Spirit Board), which were eventually provided.   (Id. ¶¶ 13–17, 18.)

The plaintiffs seek injunctive relief—specifically reinstatement of the policies and procedures initially agreed upon in PRG-26 after the 2009 Newberg I complaint—and monetary damages.   (NDoc. 34 at 6–7.)

The defendants move to dismiss the consolidated complaint.   (NDoc. 35.) The defendants assert that: (1) the staff at the FCCC were within their purview to limit gatherings in an effort to curtail the spread of COVID-19;[6] (2) the residents' time at the grassy knoll has been limited to allow the staff better ability to monitor

---

[6] In their response, the plaintiffs abandon their COVID-19 related claims, stating that "they fully understand and agree that this was an unprecedented time under unprecedented circumstances.   The Plaintiffs have stated their claims were either prior to COVID or after the restrictions were lifted and the religious practices were reinstated."   (NDoc. 38 at 4.)

the facility; (3) the Native American community is allowed to smudge during their one-hour a week prayer sessions on the grassy knoll; (4) Mr. Lorch and Mr. Newberg were allowed to practice their faith despite being restricted from attending Native Circle for a period of time; (5) Defendant Masters' temporary tobacco prohibition did not rise to the level of a constitutional violation; (6) the plaintiffs' allegations that their religious items were mishandled are too vague to state a claim; (7) Mr. Lorch's claims that he has been unable to obtain certain items is moot since he admits that these items were ultimately provided; and (8) the plaintiffs raise no specific claims against Defendant Wellpath.   (NDoc. 35.)   The defendants do not address the plaintiffs' RLUIPA claims.

The plaintiffs responded to the consolidated motion to dismiss (NDoc. 38), which is ripe for review.

## II.     Legal Standards

### A.     Motion to Dismiss

In evaluating a motion to dismiss, this Court accepts as true all factual allegations in the complaint and construes them in the light most favorable to the plaintiff.   Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1262–63 (11th Cir. 2004).   Further, this Court favors the plaintiff with all reasonable inferences from the allegations in the complaint.   Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990) ("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true.").   However, the Supreme Court has explained that factual allegations must be more than speculative:

> While a complaint attacked by a <u>Rule 12(b)(6)</u> motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.   Factual allegations must be enough to raise a right to relief above the speculative level.

<u>Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)</u> (internal citations and quotation marks omitted).   Further, courts are not "bound to accept as true a legal conclusion couched as a factual allegation."   <u>Papasan v. Allain, 478 U.S. 265, 286 (1986)</u>.

In <u>Ashcroft v. Iqbal, 556 U.S. 662 (2009)</u>, the Supreme Court, referring to its earlier decision in <u>Twombly</u>, set forth a two-pronged approach to evaluate motions to dismiss.   First, a reviewing court determines whether a plaintiff's allegation is merely an unsupported legal conclusion that is not entitled to an assumption of truth.   Next, it determines whether the complaint's factual allegations state a claim for relief that is plausible on its face.   <u>Iqbal, 556 U.S. at 678</u>–79.   Evaluating a complaint under Rule 12(b)(6) is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   <u>Id. at 679</u>.

### B.    First Amendment (Free Exercise)

The First Amendment prohibits Congress from enacting any law "prohibiting the free exercise" of religion.   See U.S. CONST. amend. I.   It applies to the states through the Due Process Clause of the Fourteenth Amendment.   See <u>Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 489 n.1 (1996)</u>.   Under the First Amendment, the government may not dictate what an individual can believe, but it may enact "neutral and generally applicable laws that incidentally burden religious conduct

and exercise." Dorman v. Aronofsky, 36 F. 4th 1306, 1312 (11th Cir. 2022).   And
as "long as the restriction or prohibition of religious conduct or exercise is not 'the
object' of the regulation 'but merely the incidental effect of a generally applicable
and otherwise valid provision, the First Amendment has not been offended.' "   Id.
(quoting Emp. Div., Dep't of Hum. Res. Of Oregon v. Smith, 494 U.S. 872, 878
(1990)).   In the prison setting, a policy restricting the free exercise of religion is
valid under the First Amendment "if it is reasonably related to legitimate
penological interests."   Turner v. Safley, 482 U.S. 78, 89 (1987); see also O'Lone v.
Estate of Shabazz, 482 U.S. 342, 349 (1987) (applying the Turner standard to a free
exercise of religion claim); Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000).

### C.   The RLUIPA

"The RLUIPA was enacted, in part, to address the 'frivolous or arbitrary'
barriers imped[ing] institutionalized persons' religious exercise.' " Dorman, 36
F.4th at 1313 (quoting Cutter v. Wilkinson, 544 U.S. 709, 716 (2005) (citing 146
Cong. Rec. 16698, 16699 (2000))).   Section 3 of the RLUIPA states in pertinent
part:

> No government shall impose a substantial burden on the
> religious exercise of a person residing in or confined to an
> institution, . . . even if the burden results from a rule of
> general applicability, unless the government
> demonstrates that imposition of the burden on that
> person –
>
> > (1) is in furtherance of a compelling governmental
> > interest; and
> >
> > (2) is the least restrictive means of furthering that
> > compelling governmental interest.

42 U.S.C. § 2000cc–1(a).   The RLUIPA provides greater religious protection than the First Amendment.   See Cutter, 544 U.S. at 716–17 ("To secure redress for inmates who encountered undue barriers to their religious observances, Congress carried over from [the] RFRA the 'compelling governmental interest'/'least restrictive means' standard.").

### III.   Discussion

The Court liberally construes the claims as falling roughly into two categories.   First, the plaintiffs raise claims against specific individuals (named and unnamed) who allegedly committed discrete unconstitutional actions such as temporarily banning the use of tobacco, mistreating certain religious items, and refusing to initially provide requested religious paraphernalia.   Some of these claims are raised under the RLUIPA and First Amendment, while others are raised under the First and Fourteenth Amendments.   (NDoc. 34 at 3–6.)   Because these claims appear to be based on specific actions by specific individuals and seek damages (as opposed to injunctive relief), the Court will refer to these claims as "damages claims."

Next, the plaintiffs argue that Wellpath Recovery Solutions, LLC has substantially burdened their free exercise of religion by abrogating the prior policy governing their worship schedule (PRG-26) in favor of new rules allowing only a once-weekly gathering at the grassy knoll.   This "policy claim," which is directed towards the current policies at the FCCC and seeks primarily injunctive relief, is raised under both the RLUIPA and First Amendment.   (NDoc. 34 at 3.)

A.     **Damages Claims**

The plaintiffs allege several bare claims against individual defendants.   For example, they allege that Defendant Masters suspended the use of tobacco (for everyone) for six months without considering the ramifications of the suspension on the Native American residents' religious practices.   (NDoc. 34 at 4, ¶ 7.)   They assert that Mr. Lorch was prohibited from attending religious ceremonies while on wing restriction.   (Id. at 4, ¶ 7.)   They assert that unnamed defendants "mishandled" certain undescribed religious items and that unnamed defendants denied (but later accommodated) several of Mr. Lorch's requests for religious items. (Id. at 5, ¶¶ 10–14.)

The plaintiffs do not provide specific dates or descriptions of the circumstances surrounding any defendant's allegedly unconstitutional actions. And except for Ms. Masters, the plaintiffs do not tether specific instances of unconstitutional behavior to offending individuals.   Instead, they invite the Court to comb through the records of the three separate cases undergirding the consolidated complaint and find the "grievances, letters, policies" they provided to the Court at some time in the past, but which are not attached to the consolidated complaint.   (NDoc. 34 at 6, ¶ 20.)   Moreover, even if the Court was inclined to consider other (unattached) pleadings, the plaintiffs do not provide pinpoint citations (or case numbers, docket numbers, or page numbers) to specific portions of the record that allegedly contain the factual allegations that support or clarify their claims.   When facing a situation like this, a court is not "required to comb through an incomprehensible pleading in order to cobble together a claim on Plaintiff's

behalf."   Gold v. Geo Gr., Inc., No. 2:16-cv-73-FTM-29MRM, 2016 WL 7034404, at *4 (M.D. Fla. Dec. 2, 2016).   Even in the case of *pro se* litigants, the court does not have a "license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." GJR Invs. v. Cnty. Of Escambia, Fla., 132 F.3d 1359, 1369 (11th Cir. 1998) (citations omitted), overruled on other grounds by Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010).

In addition, while the plaintiffs argue that the provision of certain religious items was delayed because of the "lack of budget" at the FCCC (NDoc. 34 at 4, ¶ 4), they are reminded that the "RLUIPA does not require a State to pay for an inmate's devotional accessories." Cutter v. Wilkinson, 544 U.S. 709, 720, n.8 (2005); see also Van Whye v. Reisch, 581 F.3d 639, 657 (8th Cir. 2009) ("RLUIPA does not require the prison to permit an inmate to possess every tangential item of property that could aid the inmate's religious exercise or learning.").   Because the RLUIPA provides greater religious protection than the First Amendment, "[i]f a claim fails under the RLUIPA . . . it necessarily fails under the First Amendment." Dorman, 36 F.4th at 1313.

Accordingly, all damages claims (except for the claim based upon Defendant Masters' alleged six-month suspension of tobacco use) are dismissed under Rules 8 and 10 of the Federal Rules of Civil Procedure and because the plaintiffs do not adequately state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).[7]

---

[7] The dismissal is without prejudice.   To the extent any plaintiff believes he can state a claim for damages against a specific named individual, he must file a

**B.    Policy Claims**

Before considering the policy claims raised in the consolidated complaint, the Court will briefly discuss those raised by Mr. Newberg in 2009 in <u>Newberg I</u> and the resolution of that case   In <u>Newberg I</u>, Mr. Newberg alleged that the administrator of the FCCC implemented a smoke-free policy that infringed upon his ability to practice his Native American faith.   He sought injunctive relief in the form of an order:   (1) allowing Native American residents to use tobacco in Native American rituals; (2) providing an area for the Native American community to practice their rites and rituals; and (3) providing an area for a sweat lodge and fire pit.   (See <u>Newberg I</u> at D.E. 8.)   He only sought declaratory and injunctive relief.   (<u>Id.</u>)   The defendants (GEO and the Florida Department of Children and Families) moved for summary judgment, arguing that most of the claims were moot due to a newly-implemented FCCC policy (PRG-26) permitting Native American residents to smoke tobacco, smudge, and perform other religious ceremonies and that the FCCC had a compelling reason to prohibit the construction of a sweat lodge, fire altar, and fire pit.   (<u>Id.</u>)   In a thoughtful 29-page opinion, the Honorable Judge Charlene Honeywell found that the FCCC's new policy rendered Mr. Newberg's first claim moot.   Specifically, she found as follows:

> GEO presents evidence that the FCCC Chaplain submitted a report to the administration in May 2009, requesting that GEO change its current policy at the FCCC dealing with Native American religious practices.   The Chaplain recommended that GEO "adopt the Florida Department of Corrections policies" concerning the practices of "Smudging" and the use of the "Sacred Pipe Ceremony."   As a result, since the filing of the

---

new, separate complaint.

15

Amended Complaint, GEO enacted policy PRG-26 entitled "Guidelines for Native American Religious Observances," effective on July 20, 2009, at the FCCC.   The policy sets forth specific guidelines for implementing The Sacred Pipe Ceremony, Smudging, Control of Ceremonial Pipe/Sacred Items, Group Worship, and Basic Beliefs.   In pertinent part, the following changes have occurred as a result of the newly adopted policy:

> The FCCC now allows Native American residents to participate in the "Sacred Pipe Ceremony" and smoke ceremonial tobacco at each of their regular and special ceremonies. Indian tobacco, herbs, prayer pipes, and other ceremonial supplies are purchased online from a Native American retailer (www.crazycrow.com) for this purpose through a combination of resident and facility funds. The tobacco and herbs are securely maintained by the Chaplin between ceremonies.

The FCCC now allows Native American residents to participate in the ceremonial act of "Smudging" (the purification and cleansing with smoke from smoldering sage, sweet grass, cedar, or kinnik-kinnik) at each of their regular and special ceremonies.

In addition to permitting the use of the sacred pipe and smudging, GEO provides evidence that:

> The FCCC allows Native American residents to meet, outdoors, three times a week for ceremony and spiritual prayer.   These meetings generally consist of two daytime meetings (from 2:30 to 4:00 p.m.) and one evening meeting (from 6:30 to 8:30).   In addition to these regular meetings, Native Americans are allowed additional meetings on days of unique spiritual importance - such as a New Moon.   Native Americans at the FCCC are also permitted to hold two "Pow-Wows" a year which can each last a full day.

> The FCCC has set aside designated grounds for the Native American community to hold ceremonies outdoors. At this location, Native American's have erected a Prayer Circle of their own design prescribed by landmarks such as plants, stones, and dirt.

As a result of the aforementioned policy changes at the FCCC, GEO submits that Plaintiff's claims regarding the prohibition

> against tobacco, smudging and unavailability of a designated
> area for religious ceremonies are moot and must be dismissed.
> The Court agrees.
>
> . . .
>
> Based upon the Affidavit of Timothy Budz and the exhibits
> attached thereto, subsequent to the filing of this action, the
> FCCC enacted and implemented specific policies that now
> permit Native Americans to participate in the Sacred Pipe
> Ceremony and Smudging, which utilize tobacco, sage, cedar,
> sweet grass and kinnik-kinnik.   Further, FCCC has established
> specific time periods to ensure that Native Americans can
> observe and participate in religious ceremonies outside on
> grounds designated for use only by the Native Americans.
> Plaintiff has not presented any evidence that GEO intends on
> withdrawing any aspect of the newly enacted policy.   See Nat'l
> Adver., 402 F.3d at 1334 (recognizing that a plaintiff has a
> heavy "burden of presenting affirmative evidence" that a state
> actor might reenact a challenged policy).
>
> The Court finds Plaintiff's First Amendment free exercise claims
> premised on:   (1) GEO's prohibition of tobacco which prevents
> Plaintiff from the ability to engage in the Sacred Pipe Ceremony
> and Smudging; and, (2) GEO's refusal to provide an area for the
> Native Americans to set up a Sacred circle for its rites and
> rituals are moot.   Consequently, the Court dismisses these
> claims.

(Newberg I at D.E. 39 at 8–10, 12 (citations to the record omitted and slight

formatting changes made for clarity).)[8]   While the parties did not enter into a

formal settlement agreement in Newberg I, it is clear that Judge Honeywell

dismissed Mr. Newberg's claims as moot because the FCCC's new policy (PRG-26)

provided specific times for Native American residents to practice their religious

---

[8] Judge Honeywell further found the FCCC's prohibition against permitting
a sweat lodge at the FCCC was reasonably related to a legitimate security interest
and granted summary judgment in favor of the defendants on that claim.
(Newberg I at D.E. 39 at 21–22.)

rituals and because there was no evidence that the FCCC intended to withdraw PG-26.  The Court keeps <u>Newberg I</u> in mind when reviewing these newer claims.

### 1.    The RLUIPA Claims

Under the RLUIPA, it first falls to the plaintiff to demonstrate that the government practice complained of imposes a substantial burden on his religious exercise.  <u>Dorman</u>, 36 F.4th at 1313.   If the plaintiff makes this showing, the burden then shifts to the government to show that its action or policy is "the least restrictive means of furthering a compelling governmental interest."  <u>Ramirez v. Collier</u>, 595 U.S. 411, 425 (2022) (citing 42 U.S.C. § 2000cc–1(a)).

The plaintiffs seek the right to "utilize the designated religious grounds and native tobacco during [their] prayers" three times per week and assert that smudging is a central part of their religious practices.   (NDoc. 34 at 3, p 4, ¶¶ 1, 4.)  The plaintiffs assert that under PRG-26, they were allowed three meetings per week at the grassy knoll plus extra time for "unique spiritual observances" for over a decade.   In fact, these meetings continued until COVID-19 required drastic (and perhaps necessary) reductions in all group activities (not just religious meetings).  (Id. at 4, ¶ 5.)   The plaintiffs now assert that post-COVID, they are only permitted to access the Native Circle once a week for one hour, "contrawise [sic] to the agreed upon policy [of PRG-26]."   (Id.)   The defendants argue that the plaintiffs don't need to meet at the prayer circle more often than currently scheduled because they "can pray and worship their chosen faith outside of the one-hour time period for Native Americans noted on the Religious Services Program Schedule."   (NDoc. 35 at 12).  Remarkably, on the same page, the defendants also explain that the Native

Americans are allowed only one hour per week to smudge and that "[t]hese sessions are monitored by security staff <u>to ensure that smudging does not carry over to time periods outside of the one hour a week prayer gatherings</u>."   (Id. (emphasis added).)

Because the plaintiffs plausibly assert that a central tenet of the Native American belief system requires the use of tobacco or other herbs during prayer,[9] the plaintiffs cannot simply pray in their dorm rooms or elsewhere on the FCCC campus as tobacco is not allowed in those areas—indeed, the defendants admit that smudging is allowed <u>only</u> during the one-hour weekly prayer session on the knoll. And even if there were alternatives for the plaintiffs to pray somewhere other than the grassy knoll or to practice their faith in another manner, under RLUIPA, the "substantial burden inquiry asks whether the government has substantially burdened religious exercise . . ., not whether the RLUIPA claimant is able to engage in other forms of religious exercise."   Holt v. Hobbs, 574 U.S. 352, 361–62 (2015).

Since the plaintiffs adequately allege that the FCCC's new policy impinges upon their exercise of religion, the burden shifts to the defendants to show that their decision to discontinue the three-meetings-per-week policy of PRG-26: "(1) [was] in furtherance of a compelling governmental interest; and (2) [was] the least restrictive means of furthering that compelling governmental interest."   Holt, 574 U.S. at 362 (citing section 2000cc-1(a))(alterations in original).   Defendants do not address the plaintiffs' RLUIPA claims in their motion to dismiss.   And—in light of

---

[9] Nothing in the pleadings suggests (and the defendants do not argue) that the plaintiff's requests for additional worship time are not based on sincerely held religious beliefs.

the FCCC's decade-long adherence to PRG-26—making a showing of "least restrictive means" at this stage of litigation would be difficult.   The defendants do not allege that PRG-26 was unsustainable or caused such problems for the FCCC that a 67 percent reduction in the weekly prayer-circle time was warranted. Instead, they argue that the FCCC limited the amount of time that groups could use the grassy knoll "in order to improve the security of the area."   (NDoc. 35 at 12.)   They explain that "[t]his allows staff the ability to monitor the various areas of the facility where the sessions are ongoing to ensure that security of the facility is not compromised by fights or other actions that would jeopardize the safety of staff and residents."   (Id.)   In other words, the defendants do not assert that the changes to PRG-26 were designed to address security issues at the grassy knoll or that the plaintiffs (or any other religious groups using the grassy knoll for their worship services) presented a greater-than-average security risk when they used the area for their religious meetings.   Rather, the defendants appear to argue that it was necessary to curtail the residents' use of the grassy knoll because the FCCC security personnel could be better utilized at different areas of the facility.   This argument does not carry the day—the defendants cannot shield themselves from liability under the RLUIPA by simply claiming that accommodating the plaintiffs' religious activities would require them to have additional security personnel present to monitor the activity.   See Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 730 (2014) (recognizing that "RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs"); 42 U.S.C. § 2000cc-3(c)("[T]his chapter may require a government to incur expenses

in its own operations to avoid imposing a substantial burden on religious exercise.");

United States v. Sec'y, Fla. Dep't of Corr., 828 F. 3d 1341, 1347 (11th Cir. 2016)

(quoting 42 U.S.C. § 2000cc-3(c) for the proposition that a government may have to

incur expenses to comply with RLUIPA).

In accordance with the above, and accepting the plaintiffs' allegations as true

(as the Court must at this stage of litigation), the plaintiffs have stated plausible

RLUIPA claims against WellPath Recovery Solutions, LLC regarding the

abrogation of PRG-26 and the six-month restriction on tobacco use.[10]

### 2.    The First Amendment Claims

The plaintiffs also bring their claims under the First Amendment.   Prisoners

retain their First Amendment rights, including rights under the free exercise of

religion clause; however, "[l]awful incarceration brings about the necessary

withdrawal or limitation of many privileges and rights, a retraction justified by the

considerations underlying our penal system."   O'Lone v. Estate of Shabazz, 482

U.S. 342, 348 (1987).   Deference is given to prison officials, and, as a result, courts

employ a "reasonableness" test to determine whether a regulation infringes

constitutional rights.   Id. at 349.   Unlike the standard under the RLUIPA, the

"least restrictive" standard does not apply to a First Amendment claim.   Id. at 350.

---

[10]   The caselaw is unsettled as to whether the RLUIPA provides for monetary
damages against a private corporation such as WellPath (or its employees) when
the corporation is performing a state function.   See Robbins v. Robertson, 782 F.
App'x 794, 801 n.4 (11th Cir. 2019) ("[T]he district court correctly concluded that
RLUIPA does not create a cause of action against state officials in their individual
capacities, and sovereign immunity bars RLUIPA claims for money damages
against state officials in their official capacities." (citation omitted)).   This issue
may be briefed by the parties in their motions for summary judgment if necessary.

The appropriate standard against which to measure a civil detainee's constitutional claims is "a variant of the standard established by the Supreme Court in Turner v. Safley for reviewing the constitutional claims of prisoners." Pesci v. Budz, 935 F.3d 1159, 1165 (11th Cir. 2019.)[11]   The Eleventh Circuit summarized this standard as follows:

> When a prison regulation or policy "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 85, 89, 107 S.Ct. 2254 (internal citation and quotation marks omitted).   The Court then identified four "factors that are relevant to, and that serve to channel, the reasonableness inquiry." Thornburgh v. Abbott, 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (applying Turner).   They are:
>
> > (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it;
> >
> > (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates;
> >
> > (3) whether and the extent to which accommodation of the asserted right will have an impact on prison

---

[11]   The Eleventh explained that similar concerns and considerations apply to both prisons and civil commitment centers, and in both settings, the courts must "protect constitutional rights while showing appropriate deference to facility administrators." Pesci, 935 F.3d at 1166.   However, in cases brought by civil detainees, the Turner standard is modified to reflect the "salient differences between civil detention and criminal incarceration." Id. (citing Pesci v. Budz, 730 F.3d 1291, 1297 (11th Cir. 2013)).   To this point, while retribution and general deterrence would not be a proper foundation for the restriction of a civil detainee's constitutional rights, they would be legitimate justifications for a restriction in a prison setting. Id. at 1166.   Nevertheless, "institutional order, safety, and security remain paramount in the civil detention context, as do the rehabilitation and treatment of civil detainees." Id. (alterations and quotation marks omitted). Therefore, "[a]part from the narrowed universe of justifications, Turner and its progeny govern [FCCC cases]." Id. at 1166.

> staff, inmates, and the allocation of prison
> resources generally; and
>
> (4) whether the regulation represents an
> "exaggerated response" to prison concerns.
>
> Pope v. Hightower, 101 F.3d 1382, 1384 (11th Cir. 1996)
> (quoting Turner, 482 U.S. at 89–91, 107 S. Ct. 2254).
> This reasonableness inquiry recognizes that courts do not
> sit as super-wardens, and ensures that prison officials,
> rather than judges, will "make the difficult judgments
> concerning institutional operations." Turner, 482 U.S. at
> 89, 107 S. Ct. 2254 (quoting Jones v. North Carolina
> Prisoners' Labor Union, Inc., 433 U.S. 119, 128, 97 S. Ct.
> 2532, 53 L.Ed.2d 629 (1977)).

Id. at 1165–66.   As discussed supra, the defendants argue that limiting the time

religious groups can use the grassy knoll allows the FCCC to utilize their security

staff at other areas of the facility.   (NDoc. 35 at 12.)   They also argue that the

Native Americans can simply pray and worship elsewhere at the facility, while

simultaneously asserting that the plaintiffs' smudging ceremony may not "carry

over to time periods outside of the one hour a week prayer gatherings."   (Id.)

While the Court is required to afford deference to the judgment of those in charge of

making security decisions at state facilities, the Turner standard "is not toothless."

Thornburgh v. Abbott, 490 U.S. 401, 414 (1989).   The Eleventh Circuit has

explained that for a prisoner to bring a First Amendment challenge to a policy

under Turner, he "must do more than propose a personal accommodation.   He must

present an obvious alternative policy that could replace the current one on a prison-

wide scale."   Rodriguez v. Burnside, 38 F. 4th 1324, 1333 (11th Cir. 2022) (citing

Turner, 482 U.S. at 93).   And by arguing for the re-implementation of PRG-26 and

asserting that this policy worked without incident before COVID-19 caused a

curtailment of all meeting activity, this is precisely what the plaintiffs do in their consolidated complaint.

In accordance with the above, and accepting the plaintiffs' allegations as true (as the Court must at this stage of litigation), the plaintiffs have stated plausible First Amendment claims regarding the abrogation of PRG-26 and the six-month restriction on tobacco use.

## IV.   Conclusion[12]

This case may proceed under both the First Amendment and the RLUIPA on the damages claim against Ms. Masters relating to the six-month suspension of tobacco use at the FCCC.   The case may also proceed under both the First Amendment and the RLUIPA against Wellpath Recovery Solutions, LLC on the policy claim relating to the post-COVID reduction in worship times at the FCCC. All other claims are dismissed for failure to state a claim on which relief may be granted.   Therefore, all defendants except Ms. Masters and Wellpath Recovery Solutions are dismissed from this action.

---

[12] With the dismissal of most claims against the individual defendants (and the unsettled question of whether the RLUIPA provides for damages—as opposed to only injunctive relief—in situations such as this one), the plaintiffs' prospect of receiving substantial monetary damages if this case proceeds to trial appears low. Likewise, given that PRG-26 was in place for over a decade without incident caused by the Native American community and given that Judge Honeywell dismissed Newberg I after finding that withdrawal of PRG-26 was unlikely, the prospect of the plaintiffs receiving some degree of injunctive relief appears high.   Now that this Order streamlines the claims and standards of review for this type of complaint, the remaining parties are urged to reconsider their positions regarding settlement instead of continuing to litigate this four-year-old case.   The parties are not, of course, required to do so.

The remaining claims in all three cases involve the same parties as well as common questions of law and fact.   In fact, the claims and defendants are identical   See Fed. R. Civ. P. 42(a).   Therefore, consolidation of these cases will promote the interests of judicial economy and convenience and is unlikely to yield any substantial inconvenience, delay, or expense for the Court or the parties.   Further, consolidation will not lead to prejudice or possible confusion, unfair burdens on the parties or witnesses, or undue length of time to resolve a consolidated case.   For these reasons, the Court consolidates these three cases under Rule 42(a) of the Federal Rules of Civil Procedure for all further purposes.   See also, Local Rule 1.07(b), M.D. Fla.

Accordingly, it is **ORDERED** that:

1.   The defendants' motion to dismiss the Consolidated Complaint (Case Nos. 2:20-cv-646-JLB-NPM at D.E. 35; 2:20-cv-883-JLB-NPM at D.E. 38; 2:22-cv-54-JLB-KCD at D.E. 57) is **GRANTED in part** and **DENIED in part**.   As explained in this Order, all claims against Defendants Donald Sawyer, Jon Carner, and Dr. Courtney Jones are **DISMISSED**, and these defendants are dismissed from this action.   The motion to dismiss is otherwise **DENIED**.

2.   The Court **CONSOLIDATES** into case number 2:20-cv-646-JLB-NPM ("Consolidated Case") the following related cases:

· Case No. 2:20-cv-883-JLB-NPM

· Case No. 2:22-cv-54-JLB-KCD

3.   The Clerk is **DIRECTED** to:

     a.    **LIFT** the **STAYS** and **REOPEN** case numbers 2:20-cv-646-JLB-NPM, 2:20-cv-883-JLB-NPM, and 2:22-cv-54-JLB-KCD.

     b.    **FILE** a copy of this Order in each of these cases.

     c.    **CLOSE** case numbers 2:20-cv-883-JLB-NPM and 2:22-cv-54-JLB-KCD.

     d.    Deny as moot any pending motion in case numbers 2:20-cv-883-JLB-NPM and 2:22-cv-54-JLB-KCD.[13]

     d.    Update the CM/ECF for case number 2:20-cv-646-JLB-NPM to reflect the additional plaintiffs and remaining defendants.

4.    All subsequent filings shall be made exclusively in case number 2:20-cv-646-JLB-NPM.

5.    The remaining defendants shall answer the consolidated complaint within **TWENTY-ONE DAYS** from the date of this Order.

**DONE and ORDERED** in Fort Myers, Florida, on September 17, 2024.

*John L. Badalamenti*

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

Copies: Eric Newberg, Billy DeWayne Burr, Christopher A. Lorch, Counsel of Record

---

[13] The denial is without prejudice to the motion being refiled in the consolidated case if appropriate.   However, any motion filed in the consolidated case must be signed by all plaintiffs.